UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

vs.   Case No. 2:09-cr-27-FtM-29DNF

TIMOTHY WILLIAMS
_____

**OPINION AND ORDER**

This matter comes before the Court on reconsideration of its prior Opinion and Order (Doc. #92) suppressing five kilograms of cocaine seized from a vehicle driven by defendant Timothy Williams, in which defendant Jerome Melinore Fair was a passenger. The Court granted the United States' Motion to Reconsider (Doc. #95), and conducted a supplemental suppression hearing on November 3, 2009. Both of the officers who had testified at the original hearing testified again at the supplemental hearing.

**I.**

On September 14, 2009, United States Magistrate Judge Douglas N. Frazier submitted a Report and Recommendation (Doc. #86) to the undersigned, recommending that defendant Timothy Williams' Motion to Suppress (Doc. #46) and his Supplemental Motion to Suppress (Doc. #65) be denied. Defendant Williams' Objections (Doc. #87) was filed on September 18, 2009, and the Government's Response (Doc. #88) was filed on September 22, 2009. In an Opinion and Order (Doc. #92) filed on September 30, 2009, the Court adopted the

Report and Recommendation in part, but granted the Motion to Suppress (Doc. #46) to the extent that the extended detention of defendant Williams, after he refused to consent to a search of his vehicle, was found to violate his Fourth Amendment rights. Accordingly, the Court suppressed all physical evidence seized thereafter, which included five kilograms of cocaine that the officers discovered during their search of the vehicle.

The Government filed a Motion to Reconsider (Doc. #95) on October 9, 2009, to which defendant Williams filed a Response (Doc. #102) in opposition on October 22, 2009. In an Order (Doc. #104) filed on October 27, 2009, the Court granted the Government's Motion to Reconsider, as permitted by United States v. Scott, 524 F.2d 465 (5th Cir. 1975)[1]. The Court reopened the suppression hearing to allow the Government to present additional evidence and to allow defendant Williams to cross-examine and present any additional evidence as to the relevant issues. Because witness credibility would be an obvious issue, the Court withdrew the referral to the magistrate judge and scheduled the reopened suppression hearing before itself.

The sole passenger in the vehicle driven by defendant Williams, Jerome Melinore Fair, was named in a separate Indictment

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

(Doc. #38) in Case No. 2:09-cr-26.[2] Defendant Fair had initially refrained from filing a motion to suppress because as a passenger in the vehicle, he lacked "standing" to contest a search of the vehicle. The failure to file any such motion was certainly reasonable given Fair's lack of any legitimate expectation of privacy in the vehicle. United States v. Lee, 586 F.3d 859, 864-65 (11th Cir. 2009).

On October 19, 2009, defendant Fair filed a Motion to Suppress Evidence (Doc. #60, Case No. 2:09-cr-26) asserting that he did have standing to contest the legality of the *detention* and should benefit from the Court's finding in the Williams case that the continued detention was unlawful. The Government filed a Response (Doc. #62, Case No. 2:09-cr-26) stating that it had no procedural objection to defendant Fair's belated motion to suppress as to the issue of the detention of his person, although it disputed the substantive merits of defendant Fair's position as to the legality of the detention. In an Order (Doc. #65, Case No. 2:09-cr-26) filed on October 27, 2009, the Court allowed the filing of the motion to suppress by defendant Fair and set his suppression hearing to coincide with the hearing on reconsideration in Williams.

---

[2]Unless specifically identified as pertaining to Case No. 2:09-cr-26, all document references in this Opinion and Order pertain to Case No. 2:09-cr-27.

The undersigned conducted a suppression hearing on November 3, 2009. At the beginning of the hearing, the Government and defendant Fair agreed that they would adopt the testimony and evidence from the original suppression hearing in Williams, the Government would call both officers who had testified at the original suppression hearing, and counsel for Fair would have the opportunity to cross-examine both officers as to any relevant matter. (Doc. #68, pp. 5-8; Case No. 2:09-cr-26.) Both the Government and defendant Williams filed supplemental memoranda (Docs. ## 112, 113) after reviewing the transcript of the supplemental suppression hearing.

## II.

The Government argues that certain key facts from the first suppression hearing, upon which the Court relied, were either incorrect or misconstrued, as the Court had read the transcript but lacked the benefit of witnessing the officers' live testimony. The Government essentially argues that the duration of the traffic stop was not excessive, and that prior to its completion a drug dog alerted to the vehicle, which provided probable cause to arrest. Alternatively, the Government argues that even if the permissible duration of the traffic stop had expired prior to the drug dog alert, the officers had reasonable suspicion that criminal activity was afoot, which justified the continued detention of defendants.

**A. Initial Stop of the Vehicle**

As the undersigned stated in the original Opinion and Order,

> [a] traffic stop is a seizure within the meaning of the Fourth Amendment, Delaware v. Prouse, 440 U.S. 648, 653 (1979), but is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or is justified by reasonable suspicion in accordance with Terry v. Ohio, 392 U.S. 1 (1968). United States v. Harris, 526 F.3d 1334, 1337 (11th Cir.), cert. denied, 129 S. Ct. 569 (2008).

(Doc. #92, p. 5.) As to the initial traffic stop, the magistrate judge found that there was probable cause that defendant Williams was following another vehicle too closely, in violation of FLA. STAT. § 316.0895(1). The undersigned agreed, and overruled defendant Williams' objection on this issue (Doc. #92, pp. 2-3). The undersigned found that since Detective (formerly, Deputy) Stephen Kirkby had probable cause to believe a traffic infraction was being committed in his presence, the initial stop of the vehicle was constitutional. Whren v. United States, 517 U.S. 806, 811-18 (1996). The Court continues to find that the initial traffic stop of the vehicle was lawful under Whren.

The Government's Supplemental Memorandum appears to argue that the stop was an investigative stop under Terry v. Ohio, 392 U.S. 1 (1968), which was supported by reasonable suspicion to believe that criminal activity may have been afoot. (Doc. #72, p. 9.) Along this line, Det. Kirkby testified at the second suppression hearing that he had suspicions that Williams was involved in some sort of criminal activity "from the get-go" based on his driving pattern

(Doc. #108, p. 60). This driving pattern consisted of the following:

> when the vehicle passed my location, they changed lanes for no reason, got too close to another vehicle. Once I pulled out, the vehicle got back into the original lane for no reason. It then squeezed in between two other vehicles. To me, the initial traffic infraction, somewhat common, but to do it twice kind of made me wonder if something may be going on. The speed limit, did 50 mile per hour, no more, no less [in a 70 miles per hour zone].

(Doc. #108, p. 61.)

If the Government intends to argue that the initial traffic stop of the vehicle was supported by reasonable suspicion under Terry, the Court rejects that argument. The Court finds unpersuasive the Government's argument that simply witnessing the commission of these traffic infractions, which were committed in quick succession while the vehicle was traveling below the posted speed limit, gives an officer reasonable suspicion to believe that other criminal activity is afoot. The officer has articulated nothing that elevates a mere hunch to reasonable suspicion. While the Court continues to find that the traffic stop was lawful, it cannot accept the Government's new theory, relying upon Terry, of reasonable suspicion at the time of the stop.

**B. Duration and Scope of Traffic Stop**

**(1) General Principles:**

The general principles are not disputed. As stated in the original Opinion and Order:

> A routine traffic stop is more analogous to an investigative detention than a custodial arrest. United States v. Ramirez, 476 F.3d 1231, 1236 (11th Cir.), cert. denied, 551 U.S. 1108 (2007); United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). The Court therefore analyzes the legality of a traffic stop under the standard articulated in Terry v. Ohio, 392 U.S. 1 (1968). Ramirez, 476 F.3d at 1236. This requires that an officer's investigation of the traffic stop be (1) reasonably related in scope to the circumstances which justified the stop in the first place, and (2) limited in duration to the time necessary to effectuate the purpose of the stop. Ramirez, 476 F.3d at 1236; United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003); Purcell, 236 F.3d at 1277.

(Doc. #92, p. 6.)

**(2) The Court's Original Findings:**

The Court originally analyzed the events and duration of the traffic stop as follows (facts claimed by the Government to be inaccurate are emphasized in bold text):

> In this case, Deputy Stephen Kirkby made the traffic stop at 7:03 p.m. After telling defendant the reasons for the stop, Deputy Kirkby told defendant that as long as defendant had a valid driver's license and no outstanding warrants, defendant would be issued a written warning and then be free to leave. Deputy Kirkby obtained defendant's driver's license while defendant was seated in his vehicle, and then had defendant step out of his car and go back to the police vehicle while he wrote the warning. While writing the warning, Deputy Kirkby spoke with defendant, eliciting the conversations summarized in the Report and Recommendation. After about **five or six minutes** defendant stated his vehicle registration was in that vehicle, and Deputy Kirkby went back to the vehicle and asked the passenger to retrieve the registration. It took the passenger a few minutes to find the registration, and Deputy Kirkby spoke with the passenger as the passenger was looking for the registration. Deputy Kirkby brought the registration back to the police vehicle.
> Deputy Kirkby identified the written warning, Defendant's Exhibit 2, as being in his handwriting, and testified it takes anywhere between 5 and 20 minutes to

>     complete the form. (Doc. #79, p. 30.) Most of the
>     information can be obtained from defendant's driver's
>     license, but some comes from the dispatcher. (Id.)
>         Deputy Kirkby testified that **after he completed the
>     written warning**, he asked defendant if he was responsible
>     for the items inside the vehicle. Defendant said "yes."
>     (Doc. #79, p. 9.) Deputy Kirkby asked if defendant had
>     any illegal items in the vehicle, and defendant said
>     "no." Id. Deputy Kirkby asked for consent to search the
>     vehicle, and defendant declined to consent (Id. at pp. 9-
>     10.) Deputy Kirkby then radioed for backup, which he
>     testified was 13 minutes into the traffic stop. Sergeant
>     Hedrick arrived in approximately three minutes, having
>     been about three miles away. (Id. at pp. 55-56.) **Deputy
>     Kirkby waited for the Sergeant's arrival, and within
>     three minutes after the arrival obtained his drug dog
>     Sapper from his vehicle and walked it around defendant's
>     vehicle.** Sapper alerted to the vehicle, and Deputy
>     Kirkby then searched the vehicle.

(Doc. #92, pp. 7-8.)

Based upon these facts, the Court found that "the traffic stop portion of the detention was finished at approximately 13 minutes into the stop, at the point in time [Det.] Kirkby called for a backup officer. At that point in time [Det.] Kirkby had completed the warning notice, asked if there was contraband in the vehicle, requested consent to search the vehicle, and had been denied consent." (Id. at p. 8.) The Court also found that the 13-minute traffic stop was not inherently unreasonable in duration. (Id. at p. 9.) However, because Det. Kirkby continued to detain defendant Williams past that point, the issue became whether this continued detention was lawful. The Court found that the investigative detention at issue began when Williams was detained to await the arrival of a back-up officer to allow Det. Kirkby to deploy his

drug dog.  The Court further found that this delay would have been lawful had there existed reasonable suspicion of criminal activity, but found such reasonable suspicion to be lacking in this case.  (Id. at pp. 10-11.)

**(3) Reconsideration of Finding Regarding Completion of Written Warning:**

From the Court's perspective, the single most important issue is whether the Court's factual finding that Det. Kirkby asked defendant if he was responsible for the items inside the vehicle "after he completed the written warning" was correct.  The Court used this finding as to the timing of the completion of the written warning to establish that the traffic stop was finished; any continued detention thus had to be supported by reasonable suspicion, which the Court found to be absent.

The Court cited to page 9 of the first suppression hearing transcript (Doc. #79), which quite literally supports the Court's finding.  The relevant testimony was:

> Q.  After you completed the--your conversation with Mr. Fair and after you completed the written warning, did you ask Mr. Williams if he was responsible for the items inside the Ford, the vehicle?
>
> A.  I did.

(Doc. #79, p. 9.)  At the second suppression hearing, Det. Kirkby testified that his answer, "I did," related to the last portion of the question--about whether he asked Williams if he (Williams) was responsible for the items inside the Ford--and not to the timing

references set forth in the first portion of the Government's question.  Detective Kirkby testified at the second suppression hearing that, in fact, he had <u>not</u> completed the written warning at that time.  (Doc. #108, pp. 75-77, 79-80, 88-89, 108-09.)

The Court must carefully scrutinize such a change in testimony, particularly given its significance to the legal issue involved.  After full consideration, the Court credits Det. Kirkby's testimony that he had not completed the written warning at the point in time he called for a back-up officer.  The Court does so for four reasons.

First, Det. Kirkby's interpretation of his testimony is the same as that made by the magistrate judge, who saw the witness and heard the testimony when given at the first suppression hearing. The disadvantage of reviewing a "cold" transcript is that a court is unable to discern the nuances of language, tone, inflection and demeanor, which are available to the presiding judge.  In Magistrate Judge Frazier's recitation of the facts, he refers to this conversation without any indication that the written warning had been completed (Doc. #86, p. 4), finding that Sergeant (now Lieutenant) Peter Hedrick subsequently "began completing the warning and entered information into his computer for a check on many different data bases."  (<u>Id.</u> at p. 5.)  Later, Magistrate Judge Frazier found that "Sergeant Hedrick completed writing the citation and completed a computer check on the Defendant." (<u>Id.</u> at p. 10.)

Second, except for this one answer at the first suppression hearing, the testimony at both hearings was consistent with a finding of fact that the written warning was not completed at the time of Det. Kirkby's second set of questions to defendant Williams. Lieutenant Hedrick testified at both hearings that he was the one who completed the written warning. Even at the first hearing, other testimony by Det. Kirkby indicated that the written warning had not been completed until it was finished by Lt. Hedrick (Doc. #79, pp. 57-59).

Third, the Court's own experience in listening to witness testimony, as both a magistrate judge and a district judge, confirms Det. Kirkby's position. When answering a question containing multiple parts or assumptions, witnesses often answer the last portion of the question, without paying attention to or addressing what may have been said in an earlier portion of the question.

Finally, having now seen and heard the testimony of both officers concerning these matters, the Court finds the testimony of Det. Kirkby as to this matter to be credible. Accordingly, for these reasons, the Court concludes that its prior factual finding, that Det. Kirkby asked defendant Williams the second set of questions after completing the written warning, was incorrect. The Court finds that the written warning had not yet been completed when Det. Kirkby asked defendant Williams the second series of questions.

**(4) Reconsideration of Scope and Duration of Traffic Stop:**

In light of this corrected factual finding, the Court will reconsider its findings and conclusions with regard to the scope and duration of the traffic stop. For the reasons originally stated, the Court continues to find that the scope and duration of the traffic stop through Det. Kirkby's second set of questions was proper. These questions were completed about thirteen minutes into the stop (approximately 7:16 p.m.), at which time Det. Kirkby called for a back-up officer. The issue becomes whether the continued detention of defendants past this point satisfied the scope and duration requirements of a traffic stop.

The Court adopts its prior factual findings and those of the magistrate judge as to the events leading up to the time Det. Kirkby called for a back-up officer. Namely, Det. Kirkby had received defendant Williams' driver's license while Williams was seated in his own vehicle. Detective Kirkby had requested various record checks, and it was while waiting for the results that he asked the second series of questions to Williams, received Williams' declination to allow the consent search of the vehicle, and called for a back-up officer.

A factual dispute exists as to whether Det. Kirkby walked the drug dog around the vehicle before the back-up officer (Lt. Hedrick) arrived, or whether he waited for Lt. Hedrick's arrival before walking the drug dog around the vehicle. At the first suppression hearing, Det. Kirkby testified that after defendant

-12-

Williams declined to consent to a search of the vehicle during the second set of questions, he (Det. Kirkby) retrieved his drug dog from the police vehicle, waited for the back-up officer to arrive, and walked the drug dog around defendant's vehicle (Doc. #79, pp. 10-11, 48).[3] Detective Kirkby testified that Lt. Hedrick arrived at the scene "[p]robably a few minutes" after being called (Doc. #79, p. 47). Similarly, Lt. Hedrick testified at the first suppression hearing that the drug dog's "free-air sniff" had not yet occurred when he arrived (id. at pp. 62-63), and that Det. Kirkby did not walk the drug dog around the vehicle until after he (Lt. Hedrick) had arrived at the scene, had spoken to the passenger, and had begun to complete the written warning (Doc. #79, pp. 57-58). Lieutenant Hedrick testified that the drug dog sniff occurred less than three minutes after his arrival. (Id. at pp. 62-63.)

In his subsequent Affidavit and at the second suppression hearing, however, Det. Kirkby testified that he had been mistaken during his prior testimony and that he in fact had deployed the drug dog prior to Lt. Hedrick's arrival. (Doc. #96, pp. 5-6.) At the second suppression hearing, Det. Kirkby testified: "After the

---

[3]There was no ambiguity in this testimony (at least as to timing; the context makes clear that it was the dog doing the sniffing, and not the officer):
    Q. And do you wait for this backup before you do your free-air sniff with the dog?
    A. I did.
(Doc. #79, p. 48.)

-13-

clarifying questions, then I asked for another officer to respond. I continued with the normal checks that I have to do when I conduct a traffic stop. While waiting to make sure he didn't have any warrants, I retrieved my K-9 partner. I conducted a free air sniff of the vehicle." (Doc. #108, pp. 72, 73.) Detective Kirkby further testified:

> I asked for an officer to respond and at that point, I brought my dog out to break him, let him use the restroom, and than I conducted the free air sniff of the vehicle. During that time Lieutenant Hedrick arrived on scene. Due to his position, he wasn't--he wasn't directly behind me. He was in front of the vehicles. So as I was finishing up the free air sniff, that's when he turned his vehicle back around and got behind both of our vehicles. . . . I deployed my dog not knowing that he was there yet. It was during that time that I observed him show up as I was finishing up.

(Id. at pp. 74-75.) Detective Kirkby testified that he believed it was 13 to 15 minutes into the traffic stop that he deployed the drug dog and that Lt. Hedrick arrived. (Id. at pp. 80-81.) After the drug dog had been deployed but prior to Lt. Hedrick's arrival, Det. Kirkby had confirmed that Williams possessed a valid driver's license, but still needed to find out if he had any outstanding warrants. (Id. at p. 75.) After the drug dog alerted, Det. Kirkby handed Williams' driver's license and the partially completed written warning to Lt. Hedrick for completion. (Id. at pp. 88-89.)

Detective Kirkby testified that it was after reviewing his notes and the digital video discs (DVDs) made during the stops, in addition to discussing the "actual facts of the case," that he became convinced that he had not waited for Lt. Hedrick to arrive

-14-

before deploying the drug dog. (Doc. #108, pp. 120, 132.) The footage contained on both of these DVDs, entered into the record as Government's Exhibits 1 and 2, begins at approximately 8:20 p.m., nearly an hour after the events at issue had transpired. In these videos, which appear to record the same events from the same period of time but from different perspectives and distances (from Lt. Hedrick's vehicle and a third officer's vehicle, respectively), it appears that several pieces of evidence had already been collected and placed in plastic bags, on the hood of Lt. Hedrick's vehicle. The officers spend a majority of the DVDs' duration (approximately six minutes on each video) searching the area on top of and around Lt. Hedrick's vehicle for an object or objects. Thus, it is unclear to the Court how a review of either of these DVDs would provide Det. Kirkby with renewed clarity as to the timing of the deployment of his drug dog. Lieutenant Hedrick admitted that there were some discrepancies in his memory as to when the drug dog was walked around the car. (Id. at p. 23.)

The Court is not convinced that either officer really knows whether the drug dog was walked around the vehicle before or after Lt. Hedrick's arrival at the scene. Lieutenant Hedrick himself stated as much, and the Court did not find Det. Kirkby's explanation to be persuasive. Accepting the testimony from the first suppression hearing to be the more reliable, the Court concludes that Det. Kirkby called for back-up and waited for the

officer to arrive before walking the drug dog.  This short delay, however, did not extend the duration of the traffic stop.

The Court finds that Det. Kirkby and Lt. Hedrick had not received responses from all of their legitimate computer inquiries,[4] and Lt. Hedrick had not completely filled out the written warning notice, until after the drug dog alerted (Doc. #79, pp. 57-59).  Since neither the written warning nor all pending computer record checks had been completed, the Court finds that the legitimate purpose of the traffic stop had not yet been fulfilled at the time the drug dog alerted. United States v. Simms, 385 F.3d 1347, 1353 (11th Cir. 2004).  Therefore, the duration of the detention attributable to the traffic stop was approximately 20 to 22 minutes (see Doc. #108, p. 26), at which point the drug dog's

---

[4]In the second hearing, upon questioning by the Court, Det. Kirkby testified:
    Q.  And the warning citation was, what, just kind of left in limbo because you were doing the dog search and the officer hadn't arrived yet?
    A.  No, sir, I was still waiting to make sure that he didn't have any warrants.  I had stopped filling out the warning while I ran my dog, but I was still waiting for dispatch to advise whether he had any warrants or not.
    Q.  And how were you going to know whether dispatch–
    A.  They'll call on the radio, my portable radio that's attached to me.  They would say Highway 4, 65.  That would tell me whether or not he had any warrants.
    Q.  And did that happen during your dog search?
    A.  No, sir.  They hadn't gotten back to me yet.
    Q.  And did they ever get back to you?
    A.  No. Lieutenant Hedrick may have gotten on Mode 11 and contacted them and found out on his own, but they–I never actually spoke to them in reference to that.
(Doc. #108, pp. 142-43.)

alert provided probable cause. Under the circumstances of this case, that length of time was not unreasonable. E.g., United States v. Perkins, 348 F.3d 965, 969-70 (11th Cir. 2003) (citing cases discussing longer detentions). Further, the testimony at the second suppression hearing clarified that the more thorough criminal history check performed by Lt. Hedrick was part of Det. Kirkby's routine procedure,[5] which he would have ordinarily conducted had he been driving his regularly-assigned vehicle equipped with the enhanced computer capabilities, rather than a fleet spare. (Doc. #108, pp. 109-10.)

As the Report and Recommendation correctly stated, it is unnecessary to evaluate the officer's suspicion in determining the propriety of the duration of the traffic stop up to this point.

Accordingly, it is now

**ORDERED:**

1. The Court's Opinion and Order (Doc. #92) is **AMENDED** by this Opinion and Order.

2. Defendant Williams's Motion to Suppress (Doc. #46) is **DENIED** in its entirety.

3. Defendant Williams's Supplemental Motion to Suppress (Doc. #65) is **DENIED.**

---

[5]In the prior Opinion and Order, the Court had found: "It is clear that the criminal history check performed by Sgt. Hedrick was not part of Deputy Kirkby's routine procedure . . . ." (Doc. #92, p. 12.)

4. Defendant Fair's Motion to Suppress Evidence (Doc. #60, Case No. 2:09-cr-26) is **DENIED**.

5. The Clerk of the Court shall file a copy of this Opinion and Order on the docket in Case No. 2:09-cr-26.

**DONE AND ORDERED** at Fort Myers, Florida, this __8th__ day of January, 2010.

JOHN E. STEELE
United States District Judge

Copies:
U.S. Magistrate Judge
Counsel of Record
DCCD